UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

DENISE OCASIO, et el.,

     Plaintiffs,

v.                                              Case No: 8:13-cv-1962-T-36AEP

C.R. BARD, INC., et al.,

     Defendants.

_____/

## ORDER

     This matter comes before the Court on the following motions: Defendants'
Motion to Strike Plaintiff's Supplemental Expert Report of Robert M. McMeeking,
Ph.D. (Doc. 187), Defendants' *Daubert* Motion to Exclude the Opinions of Dr. Bill
Rosen (Doc. 213), Defendants' *Daubert* Motion to Exclude the Opinions of Reg Gibbs
(Doc. 214), Defendants' *Daubert* Motion to Exclude the Opinions of Gilbert Mathis,
Ph.D. (Doc. 215) and Plaintiff's respective responses in opposition (Docs. 194, 219,
217, 218). Defendants replied (Doc. 201, 229, 230), and Plaintiff sur-replied (Doc.
211). A hearing on the motions was conducted August 25, 2020. The Court, having
considered the motions, heard argument of counsel, and being fully advised in the
premises, will grant in part Defendant's Motion to Strike Plaintiff's Supplemental
Expert Report of Robert M. McMeeking, Ph.D. to the extent it goes beyond what was
permitted by the Court's Scheduling Order and deny Defendants' *Daubert* motions
regarding Dr. Bill Rosen, Reg Gibbs, and Gilbert Mathis, Ph.D.

## I.    BACKGROUND

In this products liability action, Plaintiff, Denise Ocasio, ("Plaintiff") seeks damages from Defendants, C.R. Bard, Inc. and Bard Peripheral Vascular (collectively "Defendants" or "Bard") for injuries she suffered after implantation of an inferior vena cava ("IVC") filter manufactured by Defendants that she alleges was defective.[1] Plaintiff received a Bard G2®X IVC filter ("G2 filter") while a patient at Tampa General Hospital ("TGH") in April 2010. Plaintiff has a history of severe inflammatory bowel disease ("IBD"), which is associated with an increased tendency for blood clotting. In April 2010, Plaintiff was admitted to the TGH emergency room with complaints of shortness of breath and "a really bad pain" in her chest. Plaintiff was diagnosed with a pulmonary embolism, and the Bard G2 filter was implanted to prevent additional pulmonary embolisms.

The Bard G2 filter Plaintiff received consists of two tiers of struts that make up its arms and legs. Once deployed, the filter's arms and legs open and anchor to the walls of Plaintiff's inferior vena cava. The filter then catches blood clots that could otherwise flow into the heart and lungs as pulmonary emboli.

Plaintiff alleges that her filter tilted and perforated her aorta and vertebra causing her to develop compartment syndrome in her right leg and necessitating multiple surgeries in 2012. In 2019, Plaintiff claims her filter was found to have a

---

[1] Plaintiff alleges that Defendants designed, manufactured, marketed, inspected, labeled, promoted, distributed and sold the subject IVC filter that was implanted in Plaintiff. Doc. 1, ¶ 111.

fracture. The filter was removed in October 2019, but the fractured strut remains embedded in her vertebra.

Plaintiff and her husband, Carmelo Ocasio, (collectively "Plaintiffs") filed suit against Bard in July 2013 in a seven-count Complaint. Doc. 1. Plaintiffs withdrew their fifth cause of action for breach of implied warranty of merchantability. Doc. 67 at 9. The Court granted summary judgment in favor of Bard on Counts I (negligence based on failure-to-warn and manufacturing defects), II (failure-to-warn), IV (manufacturing defect), and VI (negligent misrepresentation). Doc. 139. The claims that remain are Count I (negligence–design defect), Count III (strict products liability–design defect), Count VII (loss of consortium), and Plaintiffs' punitive damages claim. *Id.* at 19–20. The case was transferred to the Multidistrict Litigation ("MDL") on August 2015 (Doc. 142) and remained in the MDL until January 2019 when it was remanded to this Court. Doc. 144.

In support of their claims, Plaintiffs seek to offer a number of expert opinions, including those of Robert McMeeking, Ph.D., an expert in the field of biomedical mechanical failure, regarding the alleged defects of the G2 filter. Bard moves to strike portions of Dr. McMeeking's supplemental report. Doc. 187. Plaintiff also relies on the opinions of Dr. Bill Rosen, Reg Gibbs, and Gilbert Mathis, Ph.D. on the issues of causation and damages. Bard argues these experts' opinions should be excluded under Federal Rule of Evidence 702 and *Daubert*.[2]

---

[2] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993).

## II.    LEGAL STANDARD

### a.    Motion to Strike

Federal Rule of Civil Procedure 26 governs the disclosure of expert witnesses, and requires a party to provide "a complete statement of all opinions" offered by an expert witness and "the basis and reasons for them" "at the times and in the sequence that the court orders." Fed. R. Civ. P. 26(a)(2)(B) & (D). Rule 37 provides that if a party fails to conform to the disclosure requirements of Rule 26(a), the proffered information must be excluded "unless the failure [to disclose] was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). In other words, if an expert opinion is not disclosed in accordance with the scheduling order, it may be excluded under Rule 37. *See Corwin v. Walt Disney Co.*, 475 F.3d 1239, 1252 (11th Cir. 2007).

### b.    *Daubert* Motions

The admissibility of expert testimony is governed by Federal Rule of Evidence 702, which provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Rule 702 is a codification of the United States Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). In *Daubert*, the Supreme Court described the gatekeeping function of the district court to "ensure that any and all scientific testimony or evidence is not only relevant, but reliable." *Id.* at 589; *see also United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (*en banc*). The Supreme Court extended its reasoning in *Daubert* to non-scientist experts in *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999).

> In performing its gatekeeping function, the Court must consider whether:
>
> (1) the expert is qualified to testify competently regarding the matters he intends to address, (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*, and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Frazier*, 387 F.3d at 1260 (quoting *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998)). Thus, the three discrete inquiries to determine the admissibility of expert testimony are qualifications, relevance, and reliability. *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1341 (11th Cir. 2003). Although there is some overlap among these inquiries, they are distinct concepts that the Court and litigants must not conflate. *Id.*

"The burden of laying the proper foundation for the admission of expert testimony is on the party offering the expert, and the admissibility must be shown by a preponderance of the evidence." *Hall v. United Ins. Co. of Am.*, 367 F.3d 1255, 1261 (11th Cir. 2004) (citation omitted). "Presenting a summary of a proffered expert's

testimony in the form of conclusory statements devoid of factual or analytical support is simply not enough." *Cook ex rel. Est. of Tessier v. Sheriff of Monroe Cty.*, 402 F.3d 1092, 1113 (11th Cir. 2005). The admission of expert testimony is a matter within the discretion of the district court, which is afforded considerable leeway in making its determination. *Frazier*, 387 F.3d at 1258.

"The gatekeeper role, however, is not intended to supplant the adversary system or the role of the jury: '[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.' *Daubert*, 509 U.S. at 596, 113 S. Ct. 2786. The judge's role is to keep unreliable and irrelevant information from the jury because of its inability to assist in factual determinations, its potential to create confusion, and its lack of probative value." *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1311–12 (11th Cir. 1999).

## III.   DISCUSSION

### A.   Motion to Strike Dr. Robert M. McMeeking's Supplemental Report

Bard moves to strike the supplemental report of Robert McMeeking, Ph.D. to the extent it contains new opinions not permitted by the Court's Third Amended Scheduling Order. Doc. 187. The Scheduling Order permitted the following supplementation of expert opinions:

> If necessary, Plaintiffs to supplement existing case-specific expert reports on the subject filter and any new depositions taken or medical records obtained since July 1, 2019.

Doc. 180 at 1. Such limited supplemental opinions were to be disclosed by Plaintiffs by March 6, 2020. *Id.* Defendants had until April 1, 2020, to file supplemental expert reports responding to Plaintiffs' supplemental reports. *Id.* Bard contends that less than one page of Dr. McMeeking's 14-page supplemental report is devoted to case-specific opinions about Plaintiff and her filter. Thus, Bard urges the Court to strike the remainder of the report except for the section with the heading "Ms. Denise Ocasio's filter" on pages 1 and 2 of the supplemental report.

Dr. McMeeking issued his initial case-specific report in April 2014 before the case was transferred to the MDL. Doc. S-208-1. He authored the following general opinion reports while the case was in the MDL: March 3, 2017 (Doc. S-208-2); April 7, 2017; April 20, 2017 (Doc. S-208-3); and May 12, 2017. His supplemental report, which is the subject of the motion to strike, is dated March 6, 2020. Doc. S-199. The report supplements the four reports from the MDL proceeding and includes his prior report prepared in this case dated April 30, 2014.[3] *Id.* at 1. Bard argues that the McMeeking supplemental report includes new significant opinions never disclosed in the MDL and also otherwise revises or rewrites other opinions.[4] In response, Plaintiffs

---

[3] In their reply, Bard contends that Dr. McMeeking's most recent case-specific report is the one produced June 28, 2019. Doc. 201. Bard files a copy of expert disclosures and report. Doc. S-209. It appears the report produced with Plaintiffs' Second Supplemental Expert Witness Designation is the report from April 2014 as it bears that date. *See id.* at 6.

[4] Although Bard contends that the report contains "significant new opinions," Bard fails to identify which opinions are new, but rather seeks to have everything except the first section of the report stricken. According to Bard, the remainder of the report contains new opinions, revised opinions, and previously disclosed general opinions. For their part, Plaintiffs similarly do not provide clarity as they claim the opinions are not new, but rather were previously disclosed, but they fail to identify in which depositions and reports the opinions were disclosed.

contend that Dr. McMeeking's March 6, 2020 Supplemental Report does not include opinions not previously disclosed in the MDL. Doc. 208. Moreover, Plaintiffs submit that Bard cannot claim prejudice or surprise given the fact that Dr. McMeeking has been deposed at least eight times since providing his initial report in this case on April 30, 2014.

Dr. McMeeking's supplemental report includes the following eleven topic headings:

1. Ms. Denise Ocasio's Filter
2. Recovery Filter
3. Pre-Market Bench Testing of the Recovery Filter
4. G2 Filter
5. Pre-Market Bench Testing of the G2 Filter
6. Pre-Market Animal Studies for the Recovery and G2 Filters
7. G2 Express Filter
8. Pre-Market Bench Testing of the G2 Express Filter
9. Pre-Market Animal Studies for the G2 Express Filter
10. The Eclipse, Meridian and Denali Filters
11. Fatigue Endurance Limit of Medical Implant Grade Nitinol

Doc. S-199 at 1–12. For the reasons that follow, the Court will strike the portions of the supplemental report under headings 2, 3, 6, 9, 10, and portions of 11.[5]

It is undisputed that the first section titled "Ms. Denise Ocasio's Filter" was a permitted supplementation. Bard argues, however, that the remainder of the sections should be stricken as going beyond what was authorized by the Court's Third Amended Scheduling Order. The amended scheduling order (Doc. 180), which was issued following agreement of the parties (Doc. 179), allowed experts on both sides to

---

[5] The Court has numbered the sections for ease of reference. Numbering is not included in the supplemental report.

supplement opinions in their case-specific reports based on new deposition testimony and medical records since July 2019. This was not an opportunity to re-write or fine-tune every opinion offered related to Bard IVC filters. Rather, it was an opportunity to update the experts' opinions regarding Plaintiff and her specific filter based upon deposition testimony and medical records obtained since July 1, 2019. Of significance, Plaintiff's filter was removed on October 7, 2019, at which time it was confirmed Plaintiff's filter had fractured.[6] Doc. S-208 at 5.

In his initial report dated April 2014, Dr. McMeeking opined that the perforations of the vena cava wall were a result of an unacceptable design of the G2 filter. Doc. S-208-1 at 3. At the time, Plaintiff's G2 filter had perforated through the IVC wall and into Plaintiff's aorta but had not yet fractured. Doc. S-208 at 2. Plaintiffs contend the issues primarily related to migration, tilt, and perforation, and it was not until 2019 that fracture became an issue in this case. Review of Dr. McMeeking's 2014 report, however, reveals a lengthy discussion of "risk of fracture" in his initial case-specific report. Doc. S-208-1 at 8–21. The amended scheduling order specifically contemplated permitting supplementation based on medical reports obtained since July 2019. In this case, those reports confirmed a fracture, or according to Dr. McMeeking two fractures, and thus he may supplement his opinions related to fracture

---

[6] According to Plaintiff, a report from a CT scan taken on April 24, 2019, made reference to the possible fracture, noting "linear metallic densities within the retroperitoneum flanking the aorta at the level of the IVC filter that may represent strut fragments," but it was not definitive as the report goes on to say that "surgical clips could have this appearance as well." Doc. 208 at 5, n.5. Based on Dr. McMeeking's inspection of Plaintiff's filter after it was removed, it suffered two fractures. Doc. S-199 at 2.

of Plaintiff's filter. In that regard, he states that the fracture of Plaintiff's G2 filter was "consistent with defects inherent in the G2 Express filter." The report goes on to elaborate in the sections titled G2 filter and G2 Express filter on the basis and reasons for his opinions and the facts and data considered by Dr. McMeeking in reaching his case-specific opinions about Plaintiff's filter due to its alleged defects. The Court's amended scheduling order allows for this supplementation.

Bard argues that the report devotes numerous pages to filter types Plaintiff did not receive. The Court agrees and will strike those sections (numbered above as 2, 3, 10) labeled "Recovery Filter," "Pre-Market Bench Testing of the Recovery Filter," and "The Eclipse, Meridian and Denali Filters." While these passages include opinions related to tilt, migration, perforation and fatigue, which are not new opinions, the supplementation permitted by the scheduling order was to be limited to Plaintiff's filter. Dr. McMeeking's opinions on these issues in general have been previously developed in prior reports and this supplementation was not an opportunity to repeat, tweak, streamline, or otherwise elaborate on those opinions related to predecessor or successor filters.

Bard argues that the sections related to the G2 Express filter should be stricken because Plaintiff did not receive the G2 Express filter. Doc. 187 at 5. Dr. McMeeking opines that Plaintiff's filter was a G2 Express filter. Doc. S-199 at 2. Dr. McMeeking explains that the "G2 Express filter is the G2 filter with a snare hook added to the top of the cap." *Id.* at 11. He opines that there are detail differences in the shape of the outside profile of the cap, but otherwise the G2 filter is the same as the G2 Express.

As such, he claims the poor characteristics of the G2 apply equally to the G2 Express. Bard claims opinions contained in these sections are new; Plaintiffs claim the opinions were previously disclosed in prior reports and in deposition. These sections address opinions related to Plaintiff's specific filter, which Plaintiff was permitted to supplement. The Court will permit the supplementation in both sections on the G2 (Doc. S-199 at 6–10) and the G2 Express filter (Doc. S-199 at 11) (labeled above as sections 4, 7).

There are numerous sections related to testing in the supplemental report. The sections related to pre-market bench testing for the G2 filter (Doc. S-199 at 9–10) and G2 Express filter (Doc. S-199 at 11–12) will be permitted (labeled 3, 8 above), for the same reasons set forth above, as these sections supplement Dr. McMeeking's opinions regarding Plaintiff's specific filter. Dr. McMeeking previously offered opinions that Bard's testing protocol was inadequate, and thus inadequate testing is not a new opinion. *See, e.g.,* Doc. S-208-1 at 22–26.

As it relates to animal studies, Bard submits that Plaintiffs have acknowledged opinions related to animal test studies are new. Plaintiffs disagree. Plaintiffs argue that Dr. McMeeking has always offered the opinion that Bard's testing protocol to quantify the risk of tilt, migration, or perforation was inadequate. *See* Doc. S-208-1 at 21–23. Bard's counsel raised the issue of animal test studies in Dr. McMeeking's preservation deposition. Counsel cross-examined Dr. McMeeking as to whether the animal testing conducted by Bard addressed the issue of tilt and perforation. Doc. S-208-5 at 8–10. In his deposition, Dr. McMeeking questioned the adequacy of the tests to truly assess

resistance to tilt and to perforation. *Id.* at 9. In his report, Dr. McMeeking opined that the pre-market animal studies conducted by Bard were not designed to assess tilt resistance or perforation. Doc. S-199 at 10. Plaintiffs urge his testimony and report are consistent, but review of the supplemental report reflects opinions that go beyond his deposition responses on cross.  It appears the opinions related to animal studies are new and go beyond what was permitted by the Court's Third Amended Scheduling Order. Accordingly, the opinions regarding animal test studies in the supplemental report (labeled 6, 10) will be stricken. However, to the extent Bard's lawyers open the door at trial by questioning Dr. McMeeking about the Bard animal studies, Dr. McMeeking may be permitted to offer his opinions regarding same.

The final topic in the McMeeking supplemental report addresses "Fatigue Endurance Limit of Medical Implant Grade Nitinol." Plaintiffs argue these opinions are not new opinions.  Plaintiffs cite to Dr. McMeeking's April 2014 report in which he opined:

> The resulting strain increment ranges from .4% to 1.5%.  As the endurance limit for the Bard nitinol is a cyclic strain amplitude of approximately 0.45%, this simple calculation indicates a high likelihood that the arms will have fatigue failure problems when implanted.

Doc. S-208-1 at 8. The endurance or fatigue limits of Nitinol was also testified to in some detail in his preservation deposition. *See* Doc. S-208-4 at 4–13. Because his opinions related to the endurance or fatigue limits of Nitinol are not new, Plaintiffs argue they were appropriate for supplementation given the new information from Plaintiff's medical records confirming fracture of her filter. The Court agrees.

The only information possibly characterized as "new," according to Plaintiffs, is Dr. McMeeking's reference to certain research that has only recently been released for publication, which shows the actual endurance limit for Nitinol is lower than that assumed by Bard when testing their design. Doc. S-208 at 8–9. Dr. McMeeking's March 2020 report makes reference to recent data from a Society of Engineering Science Meeting in St. Louis in October 2019, regarding fatigue of medical implant grade Nitinol and demonstrates that the endurance limit for a finite positive mean strain is less than the endurance limit of the same Nitinol at zero mean strain. According to Plaintiffs, the data contradicts Bard's assumptions. Doc. S-199 at 13–14. Plaintiffs assert the new data supports Dr. McMeeking's conclusion that Bard should have more thoroughly "investigat[ed] the fatigue properties of its Nitinol at nonzero, positive mean strain." *Id.* at 14. Dr. McMeeking opines that "Bard should have carried out cyclic fatigue tests on its Nitinol wire and tubes at nonzero mean strain and should have done so once it was aware of the fatigue fractures" of the predecessor filter. *Id.* Plaintiffs contend the information was discussed in the expert's January and February 2020 depositions, and thus his opinions were appropriate for supplementation in the March 2020 report.

In Dr. McMeeking's January 2020 deposition, he generally testified as to data in the scientific literature and engineering literature regarding fatigue limit of Nitinol that is used for medical implants, and what he found was that the fatigue limit that Bard identified is at the upper end of the spectrum of data. Doc. 208-4 at 9–10. Dr. McMeeking does not reference the St. Louis conference or the percentages he cites in

13

his March 2020 report. In reviewing Dr. McMeeking's February 2020 deposition, he makes passing reference to being involved in bench tests of medical implant grade Nitinol and fatigue limits in the range of .16% which is much lower than Bard's .85%. Doc. S-208-5 at 19. But again, to the extent Dr. McMeeking is referring to the recent data presented at the October 2019 Society of Engineering Science meeting upon which he bases his conclusions on page 13 of his March 2020 report, this is wholly unclear. Plaintiffs' acknowledgement that the literature relied on is "new" appears correct, and the specificity of Dr. McMeeking's opinions related to percentages is much greater than he testified to several months prior. The Court finds these new opinions are, indeed, new and Bard would be prejudiced by not being able to conduct discovery related to the bases for these opinions. *See Mitchell v. Ford Motor Co.*, 318 F. App'x 821 (11th Cir. 2009) (district court did not abuse its discretion in striking expert where expert did not properly disclose necessary scientific bases for his expert opinion in timely fashion, which left manufacturer unable to depose expert fully or question what he relied on to form opinions). Thus, the Court will strike those specific portions of Dr. McMeeking's supplemental report on page 13 setting forth opinions stemming from the recent emergence of data. Supplementation of his report regarding fatigue failure and fatigue testing (or lack thereof) as discussed previously (*See, e.g.,* Doc. 208-2 at 65–68), as well as fatigue fracture is fair game and will not be stricken.

Accordingly, Bard's motion to strike Dr. McMeeking's report (Doc. 187) will be granted in part to the extent that the Court will strike those sections of the March 2020 supplemental report that address filters other than the filter at issue here, animal

14

testing, and new opinions related to medical grade Nitinol specifically stemming from recent data presented at the October 2019 Society of Engineering Science meeting (labeled above as topics 2, 3, 6, 9, 10, and part of 11). As noted above, if Bard opens the door to questioning on these topics, Dr. McMeeking may be allowed to offer his opinions. The motion is denied as to the rest of the topics (labeled 1, 4, 5, 7, 8, and the remainder of 11).

     **B.**    ***Daubert* Motions**

          1.    *Dr. Bill Rosen*

Bill S. Rosen, M.D., P.C., is a board-certified physical medicine and rehabilitation physician who has been designated by Plaintiffs as a testifying expert to offer opinions regarding Plaintiff's prognosis and future damages. Bard seeks to exclude the opinions of Dr. Rosen because he has not seen Plaintiff since 2014 and reviewed only a few medical records since 2014. Because Plaintiff's condition has improved since Dr. Rosen last saw her, Bard argues Dr. Rosen's opinions are "stale" and therefore unreliable. Doc. 213.

As a preliminary matter, the Court notes that Bard does not challenge Dr. Rosen's qualifications, experience, knowledge, skill, or methodology. Rather, Bard asserts that Dr. Rosen's opinions are unreliable because they have not been updated since he saw Plaintiff in 2014 when he conducted a two-hour examination and interview of Plaintiff. Based upon this exam and interview, Dr. Rosen opined Plaintiff would require extensive and specific medical and physical care for the rest of her life.

These opinions were used by Plaintiffs' expert Reg Gibbs to prepare a life care plan for Plaintiff.

Plaintiffs respond that Bard's challenge to Dr. Rosen goes to the weight of his opinions due to the passage of time and not to the admissibility of the opinions. Doc. 219. The Court agrees.

Plaintiff's filter was first placed in 2010. She began to have right leg pain in 2011, and it was discovered that Plaintiff's filter had tilted. In 2012, filter struts had perforated her aorta and vertebra. Doc. 219-1 at 7. Plaintiff underwent multiple surgical procedures in February and March 2012 to remove clots from her arteries, to remove the strut and attached clots in her aorta, to relieve pressure in her right leg, and to graft skin. Doc. 219 at 2; *see also* Doc. 219-1 at 9, 10–12, 13, 15. Thereafter, Plaintiff spent three weeks in rehabilitation before being discharged home on April 11, 2012. Doc. 219-3.

Two years later, Plaintiff was seen and evaluated by Dr. Rosen on April 7, 2014. Doc. 213-2. Dr. Rosen reviewed Plaintiff's prior medical records. Doc. 213-1 at 3. He met with Plaintiff for two hours during which time he took an extensive history and administered a full physical examination. Doc. 213-2.  Dr. Rosen prepared a detailed report and provided specific recommendations based upon his assessment of Plaintiff. *Id.*

Bard does not contend Dr. Rosen's methodology is at issue. Rather, Bard argues that Dr. Rosen's opinions are factually outdated and that provides the basis for excluding his opinions.  The Court finds that Dr. Rosen's opinions are based upon his

16

review of medical records, his examination and meeting with Plaintiff, and his experience as a board-certified physical medicine and rehabilitation physician. *See* Doc. 213-2. Bard's contention that Dr. Rosen did not consider the most recent factual information regarding Plaintiff's condition in reaching his opinions goes to the weight of Dr. Rosen's opinions which can be challenged on cross examination or by defense experts, and not to the admissibility of Dr. Rosen's opinions. *See, e.g., Rosenfeld v. Oceania Cruises, Inc.*, 654 F.3d 1190, 1193 (11th Cir. 2011) ("[I]n most cases, objections to the inadequacies of [expert evidence] are more appropriately considered an objection going to the weight of the evidence rather than its admissibility." (internal quotation marks omitted)); *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1017 n.14 (9th Cir. 2004) ("The factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination."); *Hurst v. United States*, 882 F.2d 306, 311 (8th Cir. 1989) ("Any weaknesses in the factual underpinnings of [the expert's] opinion go to the weight and credibility of his testimony, not to its admissibility."); *Cantrell v. GAF Corp.*, 999 F.2d 1007, 1014 (6th Cir. 1993) ("[The plaintiff's expert] was subject to cross-examination, and his views were countered by the testimony of defendants' expert. Under these circumstances, we find no error in the admission of [the plaintiff's expert's] testimony.").

Although Dr. Rosen did not meet with Plaintiff again, he reviewed medical records subsequent to their 2014 meeting. In a hand-written addendum dated June 25, 2019, Dr. Rosen updated his report to state he reviewed subsequent medical records

and his opinions remain the same. Doc. 213-5 at 2.  While Bard argues that Plaintiff's medical condition has significantly changed since she saw Dr. Rosen in 2014, Dr. Rosen did not have any changes in his opinions as of June 2019. Bard can certainly challenge the factual underpinnings of Dr. Rosen's opinions on cross examination or through its experts, but the Court finds that his opinions are not due to be excluded on this basis. Bard's arguments go to the weight of Dr. Rosen's opinions, not their admissibility. Accordingly, Defendants' *Daubert* Motion to Exclude the Opinions of Dr. Bill Rosen (Doc. 213) will be denied.

2.      *Reg Gibbs*

Reg Gibbs, MS, CRC, LCPC, CBIS, CLCP, FIALCP, is a Certified Rehabilitation Counselor, Certified Life Care Planner and Licensed Clinical Professional Counselor who holds a master's degree in rehabilitation counseling.  He has been designated by Plaintiffs as an expert to offer opinions regarding a life care plan and employability assessment for Plaintiff.  Bard moves to exclude the opinions and life care plan of Mr. Gibbs on the basis that his opinions rely largely on Dr. Rosen's inadmissible medical opinions regarding Plaintiff's medical needs. Doc. 214. The Court concludes above that Dr. Rosen's opinions are admissible and will be permitted. As the claimed unreliability of Dr. Rosen's opinions is Bard's only basis for seeking exclusion of Reg Gibbs's opinions, the Court similarly finds that Reg Gibbs's opinions that rely on Dr. Rosen's opinions will be permitted.

Bard does not challenge Gibbs's qualifications. Rather, the sole challenge to the life care opinions is a factual challenge based on the "staleness" of Dr. Rosen's

18

Case 8:13-cv-01962-CEH-AEP   Document 300   Filed 12/22/20   Page 19 of 21 PageID 16858

opinions. Bard's arguments about Gibbs's opinions go to the weight of Gibbs's opinions, and not to their admissibility. *See Hurst*, 882 F.2d at 311 ("Any weaknesses in the factual underpinnings of [the expert's] opinion go to the weight and credibility of his testimony, not to its admissibility."). Additionally, Gibbs relied on other sources of information besides Dr. Rosen, including interviews of Plaintiff and review of Plaintiff's medical records. Accordingly, Defendants' motion to exclude Reg Gibbs (Doc. 214) is due to be denied.

### 3.   *Dr. Gilbert Mathis*

Gilbert L. Mathis holds a Ph.D. in economics and has been a professor of economics since 1966. Doc. 218 at 2. Plaintiffs have designated Dr. Mathis as an expert to testify about Plaintiff's lost earnings and lost earning capacity. *Id.* Dr. Mathis submitted a report in 2014 (Doc. 215-1) that sets forth his opinions regarding Plaintiff's lost earnings and future lost earning capacity. He submitted an updated report in June 2019. Doc. 215-3. Bard moves to exclude the opinions of Dr. Mathis because, in rendering his opinions, Dr. Mathis failed to review or consider Plaintiff's 2019 updated deposition or the Social Security Administration's determination that Plaintiff was no longer disabled as of May 2017. Doc. 215. Plaintiffs respond that Bard's factual attack on Dr. Mathis's opinions lacks merit. Doc. 218. Plaintiffs contend that Bard's arguments go to the weight of the opinions, not their admissibility.

Bard has not challenged Dr. Mathis's qualifications, the reliability of his methodology, or the reliability of the way he applied that methodology. Bard argues that the Social Security Administration ("SSA") declared Plaintiff "not disabled" as of

19

May 2017 and Plaintiff acknowledged this in her May 2019 deposition, and yet, the economist did not factor these facts into his analysis. To the extent that Dr. Mathis failed to take into consideration certain facts, Bard may challenge the expert on cross examination. Moreover, a determination of "not disabled" by the SSA does not automatically mean Plaintiff cannot make a wage claim in this suit, and Bard does not cite authority to the Court stating otherwise.

Bard argues that Dr. Mathis's testimony would not help the jury because he cannot testify that her alleged IVC complication caused her inability to work. But, as pointed out by Plaintiffs, Dr. Mathis is an economist and is not being asked to provide a medical causation opinion. He will testify as to Plaintiff's life expectancy, actual and potential earnings, and loss of earning capacity. This type of economic expert testimony is regularly presented to and considered by juries in making their damages determinations. The motion to exclude Dr. Mathis is due to be denied.

## IV.   CONCLUSION

Accordingly, it is **ORDERED**:

1.     Defendants' Motion to Strike Plaintiff's Supplemental Expert Report of Robert M. McMeeking, Ph.D. (Doc. 187) is **granted in part** and **denied in part** as set forth herein.

2.     Defendants' *Daubert* Motion to Exclude the Opinions of Dr. Bill Rosen (Doc. 213) is **denied**.

3.      Defendants' *Daubert* Motion to Exclude the Opinions of Reg Gibbs (Doc. 214) is **denied**.

4.      Defendants' *Daubert* Motion to Exclude the Opinions of Gilbert Mathis, Ph.D. (Doc. 215) is **denied**.

**DONE AND ORDERED** in Tampa, Florida on December 22, 2020.

Charlene Edwards Honeywell
United States District Judge

Copies to:
Counsel of Record and Unrepresented Parties, if any